1
2
3
4
5
6
7
8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    EDDIE CABRERA,                          CASE NO. CV F 08-01104 LJO YNP HC

12                      Petitioner,           **ORDER DENYING PETITION FOR WRIT
                                              OF HABEAS CORPUS WITH**
13          vs.                               **PREJUDICE; DIRECTING CLERK OF
                                              COURT TO ENTER JUDGMENT FOR**
14    KEN CLARK,                              **RESPONDENT**

15                      Respondent.

16   _____/

17
           On July 31, 2008, Eddie Cabrera ("Petitioner"), a *pro se* California prisoner, filed a Petition for
18
     Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition") in this
19
     Court[1] challenging the denial of parole on November 30, 2006.[2]
20
           On March 24, 2009, Ken Clark ("Respondent") filed an Answer to the Petition.  As of the date
21
     of this Order, Petitioner has not filed a Traverse or a request for an extension of time to do so.  Thus, this
22
     matter is ready for decision.
23
     ///
24

     _____

25        [1]     At the time of filing the Petition, Petitioner was incarcerated at Corcoran State Prison in Corcoran,
     California.  (Pet. 1.)  Corcoran is in Kings County, located within the venue of this Court. 28 U.S.C. § 84(b).  The Petition
26   is properly filed in this Court, located in the district that Petitioner was in custody at the time of filing the Petition.  *See* 28
     U.S.C. § 2241(d).
27
          [2]     Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302,
28   the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

                                                       1

**PROCEDURAL HISTORY**

In 1983, Petitioner was convicted in the Los Angeles County Superior Court of murder in the second degree with use of a firearm, and two counts of assault with a deadly weapon with use of a weapon causing great bodily injury. (Pet. 1, 26; Answer Ex. 2.)[3] The superior court sentenced Petitioner to an indeterminate term of seventeen years to life with the possibility of parole in state prison, and Petitioner began his term on May 27, 1983. (Pet. 1, 26; Answer Ex. 2.) The record states that Petitioner's "minimum eligible parole date" is July 12, 1992. (Pet. 26; Answer Ex. 2.)

On November 30, 2006, Petitioner attended his eighth subsequent parole consideration hearing, and was denied parole for one year. (Pet. 25, 127.) On June 13, 2007, Petitioner filed a habeas petition in the Los Angeles County Superior Court challenging the 2006 denial of parole. (Answer Ex. 1.) On August 23, 2007, the superior court denied the habeas petition in a reasoned opinion. (*Id.* Ex. 2.) On October 17, 2007, Petitioner filed a habeas petition in the California Court of Appeal, which summarily denied the petition on November 17, 2007, citing *In re Rosenkrantz*, 29 Cal. 4th 616, 678-79, 682 (2002). (*Id.* Exs. 3-4.) On December 6, 2007, Petitioner filed a habeas petition in the California Supreme Court, which summarily denied the petition on June 11, 2008. (*Id.* Exs. 5-6.)

On July 31, 2008, Petitioner filed his federal Petition in this Court.

**FACTUAL BACKGROUND**[4]

PRESIDING COMMISSIONER PONCABARE: . . . I will proceed to reading the statement of facts into the record. I'm deriving the information from the probation officer's report of 1983.

"On December 12th, 1982, at approximately 12:00 midnight, victims Jordan [sic, Godarn] and Steven Maracle, . . . and Ronald Tatino, [drove] respondent and victim Steven Maracle's vehicle from the Baldwin Park address to the 500 block of Ralph Godarn (indiscernible) The victim's decision was based in part upon the desire to (indiscernible) at the location where they had previously resided. Prior to their arrival at the location at 3:00 a.m. the victims had all consumed a considerable amount of alcohol. Victims at this time, also attempted to obtain drugs, but were unable to do so, so they pulled in a drive-in and began drinking beer and

---

[3]    For ease of reference, the Court utilizes the CM/ECF pagination from the Petition and from the Exhibits attached to Respondent's Answer.

[4]    The Court adopts the factual background from the November 30, 2006, Board transcript as a fair and accurate summary of the evidence presented at trial. Furthermore, because Petitioner challenges the denial of parole, the Court reiterates the reasons and basis for the Board's denial from the Board transcript.

2

hard liquor. [¶]

It was at about this time that the victims first came in contact with [Petitioner and the co-defendants]. [Petitioner] and the two co-defendants were offered drinks by the victims and began drinking together. As the drinking among the subjects continued, an altercation started between the victims and the suspect. It was about this time that a fight initially began victim Steven Maracle and co-defendant Marquez . . . . During the same period of time, co-defendant Marquez responded to the home of a nearby witness, removed a .25 caliber automatic from its holster in the bedroom, and then after returning to the location, gave the weapon to [Petitioner]. As the evening wore on and the victims continued to drink, additional fighting broke out between the victims and [Petitioner and the co-defendants]. Information is unclear regarding which of [Petitioner and the co-defendants] and victims specifically were involved in the fights. Finally, after the victims were asleep or unconscious, either by the effects of the liquor or fighting, [Petitioner and the co-defendants] placed the remaining victim Steven Maracle in the back of his vehicle, joining victim Tatino. In the right front passenger seat, was victim . . . Godarn[. ¶]

[Petitioner] then entered the driver's seat of the victim's vehicle, but the vehicle would not start. Co-defendant Maldonedo . . . then pushed the four occupants of the vehicle to a point on County Road – on a county road near a reservoir in Somona [sic?]. [Petitioner] then exited the vehicle on the driver's side and withdrew the gun from his pocket. After shooting victim Godarn Maracle one time in the nose area, he shot victim Tatino one time behind the right ear, and finally fired two shots at the buttocks area of victim Steven Maracle. [Petitioner] then joined co-defendant Maldonedo in the latter's vehicle. Both of them responding back to the original location. [¶]

Somona Police called to the scene of the shooting at 5:00 a.m. found victim Godarn Maracle lying face up over the center transmission of the car. A large amount of blood was coming from his nasal area and continued over his face. The victim was breathing, but no movement was observed. The victim died soon after being taken to the Sonona [sic?] Valley Community Hospital. An autopsy report described the victim's death as a gunshot wound to the head, with perforation to the brain. Victim Tatino was found on the passenger side, sitting erect, but with a puncture wound behind his right ear. The victim was not moving or able to respond to talking or questions. Victim, Steven Maracle, in turn, was found under the rear left quarter panel of the vehicle, with blood penetrating his pants in the buttocks area."

. . . .

PRESIDING COMMISSIONER PONCABARE: . . . The panel reviewed all information received from the public, and relied on the following circumstances in concluding [Petitioner] is not yet suitable for parole, and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. [¶] The offense was carried out in an especially cruel and callous manner. Multiple victims were attacked, injured and killed in the same incident. The offense was carried out in a dispassionate and calculated manner. It was, for all intents and purposes, an execution-style murder. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. Three defenseless victims were put in their car, taken to a location, and shot. One in the face, who ultimately died, and two others were injured, as result of the gunshot wounds. One of them had to have two other surgeries and apparently one of your victims is still suffering from ringing in his ear where he was shot. The motive for the crime was inexplicable and very trivial in

3

relation to the offense.  It was unequivocally an [sic] inexplicable in terms of what actually occurred.  And quite frankly everything that you talked to and discussed with the panel today, we still have not been able to understand how this could've possibly happened in the first place.  These conclusions are drawn from the statement of facts . . . . [¶]

You did have an escalating pattern of criminal conduct and of violence.  You have failed previous grants of probation, and failed to profit from society's previous attempts his [sic] criminality, through juvenile probation. . . . [W]e did take a look at what occurred during your grant, and when I had asked you several questions about that one juvenile conviction that you said that was – had taken place in your home, and you did admit giving the murder weapon to your co-defendant, and I asked you specifically whether it was gang related, . . . you told the panel during your hearing that you were actually granted parole the opposite, you said it was gang related.  So there's been so many inconsistencies in your testimony through many panels, [Petitioner].  That was just one of many that I'm not even going to go into at this point. [¶]

You have an unstable social history.  Your criminal behavior began at an extremely young age, age 12, when by your own admission, you were affiliated with the 12th Street Pamona Gang; however, according to you, only for six months, though evidence of gang activity while incarcerated was there.  You had a serious history of alcohol abuse, and you did have limited employment while you were – prior to your incarceration. . . . [¶]

Your parole plans, [Petitioner], acknowledging the letters that you have received from your family in San Bernardino [sic] County and Riato [sic], that you do have an offer of a place to live from your brother and sister-in-law, Jose and Wendy, and the fact that your mother does reside in Riato [sic] with your sister, Lupe, there was no solid offer of employment in Riato [sic], although he did say he is a maintenance worker, and could help you look for employment, that perhaps you could work with him.  We don't have anything valid in terms of what that – you didn't know what the name of the company was, if he's on his own, I mean, we need something more, definitely more solid in terms of an employment plan in San Bernadino [sic] County.  The fact that you had a discussion with your wife last night, and at your previous hearing, you were planning to reside with her in Bakersfield, and you did have an offer of employment, although the company, the air conditioning company, that you had potential employment with, simply stated, the letter simply stated they would interview you.  The parole plans in Stockton, again, you have family in Stockton, there was a potential offer of employment there as well, and as far as the construction firm, and as well as a place to reside, but quite frankly, just way too – not solid enough, just raised a significant level of concern for us as to what would really need to take place if you were paroled today. [¶]

The district attorney from Los Angeles County, according to the Deputy District Attorney opposes your release and parole. . . . [¶]

We do think that there is – that there – you require a longer period of observation and evaluation before the board can find you suitable. . . . [¶]

DEPUTY COMMISSIONER LUSHBOUGH: . . . And I was on your [previous] panel and I did vote for your release.  That was in 2003.  The reason that it's important that the notation has been made that in 2003 you told us that you (indiscernible) in 1978 was gang related, your answer was, I would have to say yes, and today you're saying no, it wasn't.  The reason that's important is for credibility purposes, but also now, there raises another issue.  And that issue is you said that approximately 1974 to 1975, when you were 13 or 14, you were in the gang for six months.  Well now, we have this statement that says you were involved in gang activity in 1978, which I would approximately [sic] your age to be about 16, not 13 or 14.  These are credibility issues, and before you come for your next hearing, I would really encourage you to read your transcript, go back through your transcripts. . . . We need to know that we can trust what you tell us, and clearly the time in 2003, we felt we could trust what you told us.  Now, I realize that maybe that wasn't so trustworthy. . . . [¶]

PRESIDING COMMISSIONER PONCABARE: One other thing I'd like to add,

1
2
3
4
5

[Petitioner], is your closing statement, I was listening to that carefully, to see whether or not you had any – at all share with the panel any type of concern for your victims. The only time you ever talked about your victims was when you were talking to the Commissioner during the evaluation of your psychological report, and that where you had placed your victim's mother on your list. Otherwise, no talk whatsoever about your actual victim, the one who died, and this his brother, Steven, who is still alive as well as the third victim. Right, it's all about you. And quite frankly, I think you may have lost sight of why you're here in the first place. . . .

6

(Pet. 34-37, 118-27.)

7

## **STANDARD OF REVIEW**

8
9
10

The Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is thus subject to its provisions. *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997). The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

11
12
13
14
15

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

16

28 U.S.C. § 2254(d).

17
18
19
20
21
22
23
24
25
26
27

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000) (as amended). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law if no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court. *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 76-77 (2006).

28

A state court decision is "contrary to" clearly established federal law if the decision either applies

1  a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result

2  the Supreme Court reached on "materially indistinguishable" facts.  *Early v. Packer*, 537 U.S. 3, 8

3  (2002) (per curiam); *Williams*, 529 U.S. at 405-06.  When a state court decision adjudicating a claim is

4  contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by

5  § 2254(d)(1)."  *Williams*, 529 U.S. at 406.  However, the state court need not cite or even be aware of

6  the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court

7  decision contradicts them."  *Early*, 537 U.S. at 8.

8  State court decisions which are not "contrary to" Supreme Court law may only be set aside on

9  federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly

10  established federal law, or are based on 'an *unreasonable* determination of the facts.'"  *Early*, 537 U.S.

11  at 11 (*quoting* 28 U.S.C. § 2254(d)).  Consequently, a state court decision that correctly identified the

12  governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case.

13  *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam).

14  However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show

15  that the state court's application of Supreme Court law was "objectively unreasonable."  *Woodford*, 537

16  U.S. at 24-25, 27.  An "unreasonable application" is different from an "erroneous" or "incorrect" one.

17  *Williams*, 529 U.S. at 409-10; *see also Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009); *Woodford*,

18  537 U.S. at 25.

19  A state court factual determination must be presumed correct unless rebutted by clear and

20  convincing evidence.  28 U.S.C. § 2254(e)(1).  Furthermore, a state court's interpretation of state law,

21  including one announced on direct appeal of the challenged conviction, binds a federal court sitting in

22  habeas corpus.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

23  **DISCUSSION**

24  Petitioner alleges the parole board violated his right to due process because its denial of parole

25  was not supported by any evidence that Petitioner is a current and unreasonable risk to society.  (Pet. 4.)

26  Because the California Supreme Court summarily denied this claim, the Court must "look through" to

27  the last reasoned decision, that of the Los Angeles County Superior Court on habeas review.  *See Ylst*

28  *v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).  In rejecting Petitioner's claim, the superior court stated:

6

Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that [Petitioner] is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

. . . .

The record indicates this crime was especially heinous because multiple victims were attacked. (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(A).) Petitioner shot three people at close range, striking all three. Two were shot in the head, while the other was shot in the buttocks. Additionally, although she was not physically injured, a young child was left helpless and alone by [Petitioner] and his friend.

The Board also found that the motive was very trivial in relation to the offense. (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*In re Scott* (2004) 119 Cal. App. 4th 871, at 893.) In this case, [Petitioner] claims that he committed the offense because he was concerned that the victims would return to his neighborhood to find him after discovering that they had been robbed. The Board found this explanation unbelievable, stating, "And quite frankly after everything that you talked to and discussed with the panel today, we still have not been able to understand how this could have possibly happened in the first place." (*Reporter's Transcript*, November 30, 2006, p. 95.) Because the motive was materially less significant than those which conventionally drive people to shoot multiple victims, there is some evidence that [Petitioner] poses a greater risk of danger to society than is ordinarily present.

Accordingly, the petition is denied.

(Answer Ex. 2.)

Preliminarily, to the extent Petitioner contends that the Board and/or the California courts violated state law, such a claim is not cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (stating a petitioner may not transform a state-law issue into a federal one by simply asserting a violation of due process).

<u>Current State of the Law</u>

A federal due process claim is analyzed in two steps. *See Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006). "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (*quoting Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

The Ninth Circuit has found it clearly established federal law that California "vests . . . California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural

1    safeguards of the Due Process Clause." *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (as

2    amended) (*citing Bd. of Pardons v. Allen*, 482 U.S. 369, 377-78 (1987); *Greenholtz v. Inmates of Neb.*

3    *Penal & Corr. Complex*, 442 U.S. 1, 12 (1979); *Sass*, 461 F.3d at 1128; *Biggs v. Terhune*, 334 F.3d 910,

4    914 (9th Cir. 2003); *McQuillion v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002)).  A prisoner is entitled

5    to notice of the parole hearing, an opportunity to be heard, and if parole is denied, a statement of reasons

6    for the denial.  *See Greenholtz*, 442 U.S. at 16; *Jancsek v. Or. Bd. of Parole*, 833 F.2d 1389, 1390 (9th

7    Cir. 1987).

8          The Ninth Circuit has also found that "the Supreme Court ha[s] clearly established that a parole

9    board's decision deprives a prisoner of due process with respect to this interest if the board's decision

10   is not supported by 'some evidence in the record,' *Sass*, 461 F.3d at 1128-29 (citing *Superintendent v.*

11   *Hill*, 472 U.S. 445, 457 (1985)); *see also Biggs*, 334 F.3d at 915 (citing *McQuillion*, 306 F.3d at 904),

12   or is 'otherwise arbitrary,' *Hill*, 472 U.S. at 457."  *Irons*, 505 F.3d at 851.  "Additionally, the evidence

13   underlying the board's decision must have some indicia of reliability."  *McQuillion*, 306 F.3d at 904

14   (*quoting Jancsek*, 833 F.2d at 1390); *see Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per

15   curiam).  The Supreme Court has elaborated the "some evidence" standard:

16          Ascertaining whether this standard is satisfied does not require examination of the entire
            record, independent assessment of the credibility of witnesses, or weighing of the
17          evidence. Instead, the relevant question is whether there is any evidence in the record that
            could support the conclusion reached by the . . . board. . . . The fundamental fairness
18          guaranteed by the Due Process Clause does not require courts to set aside decisions of
            prison administrators that have some basis in fact.
19

20   *Hill*, 472 U.S. at 455-56 (citations omitted).  When assessing whether a state parole board's suitability

21   determination was supported by "some evidence" in a habeas case, the analysis is "framed by the statutes

22   and regulations governing parole suitability determinations in the relevant state."  *Irons*, 505 F.3d at 851

23   (*citing Biggs*, 334 F.3d at 915).

24          Thus, the Court "must look to California law to determine the findings that are necessary to deem

25   a prisoner unsuitable for parole, and then must review the record in order to determine whether the state

26   court decision holding that these findings were supported by 'some evidence' . . . constituted an

27   unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454."  *Irons*,

28   505 F.3d at 851.

1     The Board's parole suitability decisions are governed by California Penal Code section 3041 and

2  title 15, section 2402 of the California Code of Regulations.  *See In re Lawrence*, 44 Cal. 4th 1181,

3  1201-02 (2008).[5]  The Board "shall normally set a parole release date" one year prior to the inmate's

4  minimum eligible parole release date, and shall set the date "in a manner that will provide uniform terms

5  for offenses of similar gravity and magnitude in respect to their threat to the public."  *Id.* at 1202; *see*

6  Cal. Penal Code § 3041(a).  A release date must be set "unless [the Board] determines that the gravity

7  of the current convicted offense or offenses, or the timing and gravity of current or past convicted

8  offense or offenses, is such that consideration of the public safety requires a more lengthy period of

9  incarceration."  *Lawrence*, 44 Cal. 4th at 1202; *see* Cal. Penal Code § 3041(b).

10    Title 15, section 2402 of the California Code of Regulations is designed to guide the Board's

11  assessment of whether the inmate poses "an unreasonable risk of danger to society if released from

12  prison," and thus whether he or she is suitable for parole.  *Lawrence*, 44 Cal. 4th at 1202; *see* Cal. Code

13  Regs. tit. 15, § 2402(a).  "All relevant, reliable information available to the panel shall be considered

14  in determining suitability for parole."  Cal. Code Regs. tit. 15, § 2402(b).  The regulation lists factors

15  relating to suitability and unsuitability for parole.  *See id.* § 2402(c), (d).  The *Lawrence* court stated:

> [T]he core determination of "public safety" under the statute and corresponding regulations involves an assessment of an inmate's *current* dangerousness. . . . These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not logically relate to anything but the threat *currently* posed by the inmate.
> . . . .
> [U]nder the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.

*Lawrence*, 44 Cal. 4th at 1205-06, 1212.

    "Accordingly, when a court reviews a decision of the Board or the Governor, the relevant inquiry

is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes

---

[5]     The Court "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole," *Irons*, 505 F.3d at 851, and accordingly utilizes *In re Lawrence* and *In re Shaputis*, 44 Cal. 4th 1241 (2008) as the latest California Supreme Court cases discussing parole suitability.  *See Estelle*, 502 U.S. at 67-68 (stating a federal court is bound by a state court's construction of its own laws); *see also Bradshaw*, 546 U.S. at 76.

1    a current threat to public safety, and not merely whether some evidence confirms the existence of certain

2    factual findings." *Id.* at 1212.

3         With regard to the Board's reliance solely on the commitment offense to deny parole, the

4    *Lawrence* court held:

5         [A]lthough the Board and the Governor may rely upon the aggravated circumstances of
          the commitment offense as a basis for a decision denying parole, the aggravated nature

6         of the crime does not in and of itself provide some evidence of *current* dangerousness
          to the public unless the record also establishes that something in the prisoner's pre- or

7         post-incarceration history, or his or her current demeanor and mental state, indicates that
          the implications regarding the prisoner's dangerousness that derive from his or her

8         commission of the commitment offense remain probative to the statutory determination
          of a continuing threat to public safety.

9
     *Lawrence*, 44 Cal. 4th at 1214.   The California Supreme Court then gave an example of when a

10
     prisoner's commitment offense could show present dangerousness:
11
          [C]ertain conviction offenses may be so "heinous, atrocious or cruel" that an inmate's

12        due process rights would not be violated if he or she were to be denied parole on the
          basis that the gravity of the conviction offense establishes current dangerousness. In

13        some cases, such as those in which the inmate has failed to make efforts toward
          rehabilitation, has continued to engage in criminal conduct postincarceration, or has

14        shown a lack of insight or remorse, the aggravated circumstances of the commitment
          offense may well continue to provide "some evidence" of current dangerousness even

15        decades after commission of the offense.
          . . . .

16        [W]here the record also contains evidence demonstrating that the inmate lacks insight
          into his or her commitment offense or previous acts of violence, even after rehabilitative

17        programming tailored to addressing the issues that led to commission of the offense, the
          aggravated circumstances of the crime reliably may continue to predict current

18        dangerousness even after many years of incarceration.

19   *Lawrence*, 44 Cal. 4th at 1228;[6] *see also In re Shaputis*, 44 Cal. 4th 1241 (2008).

20                                              Analysis

21         Applying the aforementioned framework, some evidence in the record supports the Board's

22   _____

23        [6]     With regard to a parole board's denial based solely on the commitment offense, the Ninth Circuit has stated,
     in a decision rendered *before Lawrence*'s clarification, that:

24        [I]n all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for
          parole solely on the basis of his commitment offense comports with due process, the decision was made

25        before the inmate had served the minimum number of years required by his sentence. Specifically, in *Biggs*,
          *Sass*, and here, the petitioners had not served the minimum number of years to which they had been

26        sentenced at the time of the challenged parole denial by the Board. *Biggs*, 334 F.3d at 912; *Sass*, 461 F.3d
          at 1125. All we held in those cases and all we hold today, therefore, is that, given the particular

27        circumstances of the offenses in these cases, due process was not violated when these prisoners were
          deemed unsuitable for parole prior to the expiration of their minimum terms.

28   *Irons*, 505 F.3d at 853-54.  The Court notes that, as of the November 30, 2006, parole hearing, Petitioner had completed the
     minimum term of his seventeen years to life sentence.

1   finding that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to

2   society and a threat to the public safety if released from prison. *Hill*, 472 U.S. at 455-56; *Irons*, 505 F.3d

3   at 851; *Lawrence*, 44 Cal. 4th at 1205-06, 1212. The Los Angeles County Superior Court stated that the

4   circumstances of Petitioner's commitment offense, specifically the heinousness of the crime and

5   Petitioner's motive, provided some evidence of Petitioner's danger to society if released. (Answer Ex.

6   2.)

7       As stated by the Board, the commitment offense was "carried out in an especially cruel and

8   callous manner" and "in a manner which demonstrates an exceptionally callous disregard for human

9   suffering and life." (Pet. 118-19); *see* Cal. Code Regs. tit. 15, § 2402(c)(1)(D). In addition, the Board

10  stated that multiple victims were attacked, injured, and/or killed in the same incident. (Pet. 118); *see*

11  Cal. Code Regs. tit. 15, § 2402(c)(1)(A). As also stated by the Board, the offense was carried out in a

12  dispassionate and calculated manner, and was for all intents and purposes, an execution-style murder.

13  (Pet. 118); *see* Cal. Code Regs. tit. 15, § 2402(c)(1)(B). Furthermore, the Board stated that the motive

14  for the crime was inexplicable and very trivial in relation to the offense. (Pet. 119); *see* Cal. Code Regs.

15  tit. 15, § 2402(c)(1)(E). These factors of unsuitability for parole are supported by the facts of the

16  commitment offense recited by the Board and Petitioner's conviction. *See supra* Factual Background;

17  28 U.S.C. § 2254(e)(1).

18      Although the superior court focused exclusively on the commitment offense, other evidence in

19  the record provides some evidence of Petitioner's current dangerousness. *See Hill*, 472 U.S. at 455-56

20  ("[T]he relevant question is whether there is *any evidence in the record* that could support the conclusion

21  reached by the . . . board.") (emphasis added). The presiding commissioner at Petitioner's parole hearing

22  stated:

23          One other thing I'd like to add, [Petitioner], is your closing argument, I was
            listening to that carefully, to see whether or not you had any – at all share with the panel
24          any type of concern for your victims. The only time you ever talked about your victims
            was when you were talking to the Commissioner during the evaluation of your
25          psychological report, and that where you had placed your victim's mother on your list.
            Otherwise, no talk whatsoever about your actual victim, the one who died, and then his
26          brother, Steven, who is still alive as well as the third victim. Right, it's all about you.

27  (Pet. 126.) Signs of remorse are a circumstance tending to show suitability under the California

28  regulations. *See* Cal. Code Regs. tit. 15, § 2402(d)(3) ("Signs of Remorse. The prisoner performed acts

11

1    which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help

2    for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the

3    offense.").   The record indicates Petitioner shot three unconscious victims simply because he did not

4    want the victims to know that they had been robbed.  (*See, e.g.*, Pet. 102.)  As stated by the presiding

5    commissioner, nowhere in Petitioner's closing argument or during his hearing did he indicate that he

6    understood the nature and magnitude of the offense.  Indeed, Petitioner admitted that he could not even

7    remember the facts of the offense clearly because he was allegedly intoxicated at the time.  (*See, e.g.*,

8    Pet. 39.)  However, Petitioner also admitted that at his initial hearing in 1991 and at a subsequent one

9    in 1993, he "was not honest with the board concerning the circumstances of the crime," but that at his

10   second subsequent hearing in 1995 he "sat before the board and told them the truth, as [Petitioner]

11   recalled it."  (Pet. 112.)

12          The gravity of the commitment offense combined with Petitioner's lack of remorse or

13   understanding provides some evidence of his current dangerousness to society.  *See Lawrence*, 44 Cal.

14   4th at 1228 ("[W]here the record also contains evidence demonstrating that the inmate lacks insight into

15   his or her commitment offense or previous acts of violence, even after rehabilitative programming

16   tailored to addressing the issues that led to commission of the offense, the aggravated circumstances of

17   the crime reliably may continue to predict current dangerousness even after many years of

18   incarceration.").

19          In consideration of the aforementioned circumstances, the Los Angeles County Superior Court

20   had "some evidence," consistent with *Hill*, 472 U.S. at 454, to conclude that Petitioner constitutes a

21   current threat to public safety as articulated in *Lawrence* and in the California statutes and regulations

22   defining parole suitability.  *See Irons*, 505 F.3d at 851.

23          Accordingly, the Court finds that the California courts' rejection of Petitioner's claim was neither

24   contrary to, nor an unreasonable application of, clearly established federal law as determined by the

25   United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

26                                   **Certificate of Appealability**

27          Because Petitioner challenges the denial of parole, a certificate of appealability is not required.

28   *See* 28 U.S.C. § 2253(c)(1)(A); *Rosas*, 428 F.3d at 1231-32 (finding habeas petitioner was not required

1    to obtain certificate of appealability where "target" of his challenge was not state court judgment or

2    sentence but state Board's administrative decision to deny parole).

3                                    **CONCLUSION AND ORDER**

4            For the reasons discussed above, the Court DENIES the Petition for Writ of Habeas Corpus with

5    prejudice.  The Clerk of Court is ORDERED to enter Judgment for Respondent and to close Case No.

6    CV F 08-01104 LJO YNP HC.

7

8    IT IS SO ORDERED.

9    **Dated:    June 18, 2009**                            /s/ Lawrence J. O'Neill
                                                    UNITED STATES DISTRICT JUDGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          13